UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| STARLA D. R.[1], | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:21-cv-00348-SEB-DML |
| | ) | |
| KILOLO KIJAKAZI,[2] | ) | |
| | ) | |
| Defendant. | ) | |

**Report and Recommendation on Complaint for Judicial Review**

This matter was referred to the Magistrate Judge under 28 U.S.C. §
636(b)(1)(B) and Fed. R. Civ. P. 72(b) for a report and recommendation as to its
appropriate disposition. As addressed below, the Magistrate Judge recommends
that the District Judge REVERSE and REMAND the decision of the Commissioner
of the Social Security Administration that Starla is not disabled.

**Introduction**

Starla applied in October of 2018 for Disability Insurance Benefits (DIB)
under Title II of the Social Security Act. After her application was denied initially

---

[1]     To protect the privacy interests of claimants for Social Security benefits, the
Southern District of Indiana has chosen to use only the first name and last initial of
non-governmental parties in its Social Security review opinions. The Plaintiff will
therefore be referred to by her first name.

[2]     Kilolo Kijakazi became the Acting Commissioner of Social Security on July 9,
2021. She is substituted for Andrew Saul as the defendant under Fed. R. Civ. P.
25(d) and the last sentence of 42 U.S.C. § 405(g) (action seeking judicial review of
final decision of the Commissioner of Social Security "shall survive notwithstanding
change in the person occupying the office of Commissioner of Social Security or any
vacancy in such office").

and on reconsideration, a hearing was held on September 21, 2020, before administrative law judge Albert Velasquez. The ALJ issued his decision on October 14, 2020, that Starla was not disabled. The Appeals Council denied review on December 14, 2020. Starla timely filed this civil action under 42 U.S.C. § 405(g) for review of the Commissioner's decision.

Starla contends that the Commissioner's decision must be reversed because (1) the ALJ failed to address all of her impairments and their impact on her daily functioning and (2) the ALJ's application of SSR 16-3p in assessing Starla's symptoms was erroneous.

The court will first describe the legal framework for analyzing disability claims and the court's standard of review and then address Starla's assertions of error.

## Standard for Proving Disability

To prove disability, a claimant must show that she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). Starla is disabled if her impairments are of such severity that she is not able to perform the work she previously engaged in and, if based on her age, education, and work experience, she cannot engage in any other kind of substantial gainful work that exists in the national economy. 42 U.S.C. § 423(d)(2)(A). The Social Security Administration ("SSA") has implemented these

statutory standards by, in part, prescribing a five-step sequential evaluation process for determining disability.  20 C.F.R. § 404.1520.

Step one asks if the claimant is currently engaged in substantial gainful activity; if she is, then she is not disabled.  Step two asks whether the claimant's impairments, singly or in combination, are severe; if they are not, then she is not disabled.  A severe impairment is one that "significantly limits [a claimant's] physical or mental ability to do basic work activities."  20 C.F.R. § 404.1520(c).  The third step is an analysis of whether the claimant's impairments, either singly or in combination, meet or medically equal the criteria of any of the conditions in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1.  The Listing of Impairments includes medical conditions defined by criteria that the SSA has predetermined are disabling, so that if a claimant meets all the criteria for the most similar listed impairment, then the claimant is presumptively disabled and qualifies for benefits.  *Sims v. Barnhart*, 309 F.3d 424, 428 (7th Cir. 2002).

If the claimant's impairments do not satisfy a listing, then her residual functional capacity ("RFC") is determined for purposes of steps four and five.  RFC is a claimant's ability to do work on a regular and continuing basis despite her impairment-related physical and mental limitations.  20 C.F.R. § 404.1545.  At the fourth step, if the claimant has the RFC to perform her past relevant work, then she is not disabled.  The fifth step asks whether there is work in the relevant economy that the claimant can perform, based on her age, work experience, and education (which are not considered at step four), and her RFC; if so, then she is not disabled.

The individual claiming disability bears the burden of proof at steps one through four. *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987). If the claimant meets that burden, then the Commissioner has the burden at step five to show that work exists in significant numbers in the national economy that the claimant can perform, given her age, education, work experience, and functional capacity. 20 C.F.R. § 404.1560(c)(2); *Young v. Barnhart*, 362 F.3d 1026, 1029 (7th Cir. 2001).

## Standard for Review of the ALJ's Decision

Judicial review of the Commissioner's (or ALJ's) factual findings is deferential. A court must affirm if no error of law occurred and if the findings are supported by substantial evidence. *Dixon v. Massanari*, 270 F.3d 1171,1176 (7th Cir. 2001). Substantial evidence means evidence that a reasonable person would accept as adequate to support a conclusion. *Id.* The standard demands more than a scintilla of evidentiary support, but it does not demand a preponderance of the evidence. *Wood v. Thompson*, 246 F.3d 1026, 1029 (7th Cir. 2001).

The ALJ is required to articulate a minimal, but legitimate, justification for his decision to accept or reject specific evidence of a disability. *Scheck v. Barnhart*, 357 F.3d 697, 700 (7th Cir. 2004). The ALJ need not address every piece of evidence in his decision, but he cannot ignore a line of evidence that undermines the conclusions he made, and he must trace the path of his reasoning and connect the evidence to his findings and conclusions. *Arnett v. Astrue*, 676 F.3d 586, 592 (7th Cir. 2012); *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000).

Before addressing Starla's specific assertions of error, the court provides background information about her past work activity and her medical impairments and then summarizes the ALJ's sequential findings.

## Analysis

### I.    Background

Starla was born in 1974 and was 43 years old at the alleged onset of her disability in 2018.  (R. 22).  Starla remains insured through December 31, 2023.  (R. 15) (To be entitled to DIB under Title II, a claimant must have been disabled on or before her "date last insured," the date after which her insurance benefits under the program have expired.  *Schloesser v. Berryhill*, 870 F.3d 712, 718 (7th Cir. 2017)).  Starla has work experience as a precision lens generator, receptionist, referral and information aide, and optometric assistant.  (R. 22).

On April 4, 2018, Starla saw Dr. Brendan Leroy for migraines and dizziness; she was diagnosed with "intractable migraine with aura without status migrainosus," fibromyalgia, and chronic fatigue.  (R. 426).  A few months later, on June 11, 2018, Starla saw Dr. Leo d'Ambrosio for migraines.  (R. 560).  Dr. d'Ambrosio noted that Starla's headaches had been more frequent and that Starla had been experiencing headaches "daily for a month."  *Id.*  Starla explained that her "[h]ead pain waxes and wanes" and that, on a scale from one to ten, her pain can range anywhere from a two to a nine or a ten.  *Id.*  She also reported to Dr. d'Ambrosio that "she has excessive daytime sleepiness and had a negative sleep study in [the] past" and that "it takes [her] 1-2 hours to fall asleep and she

frequently awakens." *Id.* When Starla followed up with Dr. d'Ambrosio in August of 2018, she reported that she had had two migraines in two months and had been experiencing "milder headache[s] 2-3 times per week." (R. 564).

On September 18, 2018, Starla returned to Dr. Leroy for right hip pain. (R. 517). Dr. Leroy assessed that Starla had "[m]ild multilevel degenerative endplate changes" that were worse at Starla's L5 and L6 vertebrae. *Id.* Dr. Leroy also assessed that Starla had "[b]ilateral facet arthropathy … at L5 L6 and L6 S1." *Id.* Dr. Leroy's impression was that Starla was suffering from "mild lower lumbar spondylosis." *Id.* Starla had a lumbar spine MRI on September 26, 2018, which showed mild disc degeneration at L4-5. (R. 477). Dr. Edward Kim noted that, based on the MRI images, Starla's degeneration had "progressed since 2009." (R. 478).

Starla also had an EMG in September of 2018 at the request of Dr. Leroy. (R. 569).[3] This study demonstrated that Starla had moderate right carpal tunnel syndrome. *Id.*

Starla followed up with Dr. d'Ambrosio on November 9, 2018, and reported that her headaches had been better since she stopped working. (R. 576). She told Dr. d'Ambrosio that she felt like her headaches were stress related and that she was

---

[3]      "Electromyography (EMG) measures muscle response or electrical activity in response to a nerve's stimulation of the muscle." https://www.hopkinsmedicine.org/health/treatment-tests-and-therapies/electromyography-emg#:~:text=Electromyography%20(EMG)%20measures%20muscle%20response,the%20skin%20into%20the%20muscle.

having headaches about six days per month. *Id.* Starla also reported that she had "had an episode of 'tilting sensation'" and had fallen in her house. *Id.* Starla said that she felt dizzy on the day of the fall and that "holding her head forward and down could provoke such sensation." *Id.* She continued to complain of daytime fatigue. *Id.*

Starla saw Dr. David Josephson on November 27, 2018, for a videonystagmogram.[4] (R. 580). The test showed that Starla had "unilateral caloric weakness of 43% on the right" but revealed "no other abnormalities." *Id.* Dr. Josephson also noted that Starla's videonystagmogram was abnormal and that "[u]nilateral caloric weakness of 43% on the right is indicative of a peripheral vestibulopathy involving the right lateral semicircular canal or its afferent pathways." *Id.* Moreover, Dr. Josephson noted that Starla "scored high on the Dizziness Handicap Inventory (DHI) suggesting that psychological and emotional factors play a role in [her] report of symptoms." *Id.*

On January 3, 2019, Starla again visited Dr. d'Ambrosio for migraines. (R. 1252). She reported that "she still had balance problem[s], [but had had] no falls" over the previous two days. *Id.* Dr. d'Ambrosio noted that the "VNG showed right sided vestibular dysfunction"—a possible cause of her dizziness. *Id.*

---

[4]    "Videonystamography (VNG) is a test that measures a type of involuntary eye movement called nystagmus. These movements can be slow or fast, steady or jerky. Nystagmus causes your eyes to move from side to side or up and down, or both. It happens when the brain gets conflicting messages from your eyes and the balance system of the inner ear. These conflicting messages can cause dizziness." https://medlineplus.gov/lab-tests/videonystagmography-vng/.

A few weeks later, Starla saw Dr. Carrie Gould for "low back pain that radiates into the right hip and groin." (R. 669). Starla told Dr. Gould that she is inactive for most of the day "because she cannot tolerate being active." (R. 670). She also reported "shortness of breath and wheezing, due to asthma" and told Dr. Gould that "she takes metoprolol for heart palpitations from myocardial muscular bridge." *Id.* Dr. Gould noted that Starla was taking Zanaflex, which caused her to nap/sleep frequently, and she noted that Starla had a history of migraines and "chronic right hand numbness." (R. 670-71). Dr. Gould assessed Starla with lumbosacral spondylosis without myelopathy and displacement of lumbar intervertebral disc without myelopathy, as well fibromyalgia, chronic right hip pain, muscle spasm of the right lower extremity, and lumbar paraspinal muscle spasm. (R. 677).

On March 18, 2019, Starla followed up with Dr. Gould. (R. 705). Dr. Gould noted Starla's history of chronic fatigue, migraines, and asthma as well as Starla's "cardiac history (myocardial muscular bridge with tachycardia and history of elevated cardiac enzymes, heart murmur since childhood)." *Id.* Dr. Gould noted that Starla had "overall improvement" with her right-side low back and hip pain from physical therapy (which Dr. Gould prescribed during Starla's initial visit with her). *Id.* But Starla expressed concerns of "having [a] 'chronic fatigue flare'" and "concerns that she was overfatiguing" from her physical therapy visits. *Id.*

When she returned to Dr. d'Ambrosio on March 25, 2019, Starla reported that she was having ten to twelve migraines per month and that most of her

migraines were lasting one to two days. (R. 1257). Starla also complained of chronic headaches and said "she feels tired and fatigued" when she saw Dr. Mohammed Majid on March 29, 2019. (R. 656). Furthermore, Starla told Dr. Majid that she had had "low back pain for a long time" and difficulty with standing, moving, and performing certain chores around the house. *Id.* On examination, Dr. Majid found that Starla "appeared comfortable" and "could get on and off the examination station without support," but he observed that Starla had an "[a]ntalgic gait with right limp with cane." (R. 657). He also found "no stiffness, no effusion, no tenderness, and no swelling in the extremities," although he did note that Starla was tender in the lumbar and sacral spine. *Id.* Starla's neurologic exam revealed no muscle weakness and no atrophy, and it found that she had normal motor strength in the upper and lower extremities, normal hand grip strength, normal fine finger manipulation, and normal reflexes. *Id.*

On May 10, 2019, Starla was seen by Nurse Practitioner Michelle Hamric for chest pain, edema, and palpitations. (R. 892). NP Hamric noted Starla's medical history of myocardial bridging and atypical chest pain and noted that Starla "started having chest pain that radiates from her armpit across her chest and in her shoulder blade." *Id.* NP Hamric also noted that Starla complained of having increased fatigue and pain when taking deep breaths. *Id.*

Just over two weeks later, Starla went to the emergency room for chest pain. (R. 811). Starla described the pain to the treating physician assistant "as a squeezing midsternal pain that radiates down her left arm and into her back." *Id.*

Starla also said that the pain gets "worse when she tries to get up and move around or when she takes a deep breath" and that "she cannot walk across the room without becoming short of breath." *Id.* Two days after her emergency room visit, Starla saw Nurse Practitioner Mary Arnold; Starla reported that she was not feeling any better and that she was having constant chest pain and shortness of breath. (R. 926).

On June 12, 2019, Starla returned to NP Hamric for atrial fibrillation, myocardial bridge, chest pain, shortness of breath, edema, and palpitations. (R. 967). Starla reported that she had felt "horrible" since her last visit. *Id.* She also reported various symptoms, including weakness and malaise/fatigue, dyspnea on exertion, intermittent leg swelling and palpitations, dizziness, headaches, and light-headedness. (R. 968). On examination, NP Hamric found that Starla exhibited trace edema. (R. 969). She assessed Starla with atypical chest pain, shortness of breath, palpitations with myocardial bridging, and hypertrophic obstructive cardiomyopathy (HOCM).[5] (R. 970). The next day, Starla saw Dr. Muhamad Safia for chronic diastolic heart failure and cardiomyopathy. (R. 986). Dr. Safia diagnosed Starla with hypertrophic obstructive cardiomyopathy, chest pain, and palpitation. *Id.*

---

[5]     NP Hamric Assessment: "Atypical chest pain/SOB/palpitations in pt with myocardial bridging (normal cors 9/2017): ECHO reveals HOCM with LVOT velocity is 3.66 m/sec, with pressure gradient of 54 mmHg."

On March 16, 2020, Starla had an MRI of her cervical spine which found "progression of spondylosis with worsened degenerative disc disease at C5-6 and C6-7." (R. 1059).

On June 15, 2020, Starla went to the emergency room with shortness of breath. (R. 1293). Starla reported that she had "been using her albuterol inhaler and nebulizer without relief in symptoms." *Id.* The treating physician assistant assessed Starla with "moderate persistent asthma with acute exacerbation." (R. 1300).

Starla saw Nurse Practitioner Hilari Hunt on July 23, 2020, for back pain and associated headaches and weakness. (R. 1048). Starla also complained of "some burning pain in the triceps that traveled into the chest on the left that she described as 'heart burn' pain" and "some increased hip pain." (R. 1048-49).

At her hearing before the ALJ, Starla testified that her degenerative disc disease "makes it extremely hard for [her] to get up out of bed." (R. 33). She also stated that "it makes it hard for [her] to walk across the room," that she "can't stand for a long period of time," and that she has "to sit down because the pain is overwhelming." *Id.* When asked if she experiences migraines, Starla testified that she has "[migraines] three to four times a month; sometimes more" and that each migraine "can last anywhere between a few hours to several days." (R. 35). However, she testified that she is unable to take any migraine-specific medication because she is allergic but sometimes gets injections to help with her symptoms. (R.

35).  When she experiences a migraine, Starla testified that she is "not able to do [her] daily activities."  (R. 36).

Starla also testified that she has carpal tunnel syndrome that causes her wrist pain, particularly when using a keyboard, writing, and buttoning things.  (R. 36).  She further stated that she has excessive daytime sleepiness that is exacerbated by chronic fatigue syndrome.  (R. 38).  And she highlighted that she suffers from hypertrophic cardiomyopathy; she testified that "it causes [her] to be short of breath constantly," that it causes her heart to beat fast, and that "sometimes [she] will have episodes of palpitations."  (R. 41).  She also told the ALJ that her hypertrophic cardiomyopathy "causes a lot of fatigue because it's a lot of wear and tear on [her] heart" and that the five-pound lifting restriction she referenced earlier in the hearing was due to her hypertrophic cardiomyopathy.  (R. 34, 41).

## II.   **The ALJ's Sequential Findings**

At step one, the ALJ found that Starla had not engaged in substantial gainful activity since her alleged onset date of September 28, 2018.  (R. 17).  At step two, he determined that Starla's severe impairments were major joint dysfunction, fibromyalgia, and obesity.  *Id.*  The ALJ decided at step three that no listings were met or medically equaled.  (R. 19).

For the RFC, the ALJ decided that Starla was capable of sedentary work, "except she can lift and carry up to ten pounds occasionally and frequently."  (R. 20).  The ALJ also decided that Starla can occasionally climb stairs and ramps, can stand

and walk for two hours out of an eight-hour workday, can sit for six hours out of an eight-hour workday, and can occasionally stoop, balance, crouch, kneel, and crawl. *Id.* However, he determined that Starla can never climb ropes, ladders, or scaffolds and "should avoid concentrated wetness or vibration and avoid unprotected heights and proximity to moving mechanical parts" and can only perform work that accommodates her using a cane for ambulation. *Id.*

The ALJ found at step four that Starla could not perform her past relevant work as a precision lens generator, receptionist, referral and information aide, or optometric assistant. (R. 22). At step five, he determined that, based on the testimony of a vocational expert, Starla's vocational factors, and her RFC, Starla could perform the following jobs that existed in significant numbers in the national economy: appointment clerk, order clerk, and call out clerk. (R. 23). Accordingly, the ALJ determined that Starla was not disabled at any time between her alleged onset date of September 28, 2018, and October 14, 2020, the date of the ALJ's decision.

### III.   <u>Starla's Assertions of Error</u>

In seeking judicial review, Starla contends that the ALJ erred in two ways. First, the ALJ only found three severe impairments—major joint dysfunction, fibromyalgia, and obesity—and two non-severe impairments—anxiety and obsessive-compulsive disorder; he ignored all other impairments in the medical record including migraines, degenerative disc disease, asthma, fatigue, carpal tunnel syndrome, peripheral vestibulopathy, and hypertrophic obstructive

cardiomyopathy.  Second, when evaluating Starla's subjective symptoms, the ALJ summarized extremely select portions of the medical record and provided no reasoning or consideration of Starla's statements about her subjective symptoms as required by SSR 16-3p.

A reviewing court must determine if it can follow the ALJ's reasoning and if substantial evidence supports his decision.  *Dixon*, 270 F.3d at 1176.  It must afford an ALJ's determination special deference, and it will only reverse if the ALJ's determination is patently wrong.  *Larson v. Astrue*, 615 F.3d 744, 751 (7th Cir. 2010); *Engstrand v. Colvin*, 788 F.3d 655, 660 (7th Cir. 2015).  If the ALJ failed to build a bridge between the evidence and his conclusion, then this court must reverse.  *Ribaudo v. Barnhart*, 458 F.3d 580, 584 (7th Cir. 2006).  As will be discussed below, the court only reaches Starla's first assertion of error—that the ALJ failed to consider all of her medical impairments.

### A. The ALJ failed to consider several of Starla's impairments.

Starla argues that the ALJ failed to address evidence of all her impairments and their impact on her daily functioning.  (Plaintiff's Brief, Dkt. 15, p. 20).  At step two, the ALJ asks whether the claimant has any severe, medically determinable impairment.  If the claimant has none, then she is *not* entitled to benefits and the analysis of credibility ends.  But if the claimant has at least one severe, medically determinable impairment, then the sequential analysis continues to determine whether there is a presumptive disability at step three and, if not, whether the claimant can work despite the effects on work capacity of *all* severe and non-severe

14

impairments.  Thus, if an ALJ determines there exists at least one severe impairment, there technically is no legal error at step two.  *Curvin v. Colvin,* 778 F.3d 645, 649 (7th Cir. 2015) (A favorable disability ruling can be made only at step three or at step five, and there can be no legal error at step two where the ALJ makes "as favorable a determination as can be made" at that step by finding that the claimant has at least one severe impairment based on the objective medical evidence.)  But an ALJ's failure to address impairments at step two can be a harbinger of errors beyond step two because the ALJ may then fail to address whether the impairments he found were not severe or impairments he may have not addressed at all cause limitations in work capacity for purposes of formulating an RFC and then deciding whether the claimant can work.  *See id.* at 649-50 (Any failure to address all impairments at step two "does not matter" where the ALJ elsewhere in her decision properly considers all severe and non-severe impairments, the objective medical evidence, the claimant's symptoms, and her credibility in determining her capacity to work.)

Here, the ALJ determined that Starla suffered from three severe impairments: major joint dysfunction, fibromyalgia, and obesity.  (R. 17).  The ALJ also determined that Starla suffered from two non-severe impairments: anxiety and obsessive-compulsive disorder.  *Id.*  However, the ALJ never addressed Starla's other impairments—such as her migraines, degenerative disc disease, asthma, carpal tunnel syndrome, peripheral vestibulopathy, and hypertrophic obstructive cardiomyopathy.  The record evidence supports the existence of these impairments,

15

demonstrates that Starla has complained of issues related to these impairments, and indicates that she has seen various medical providers for treatment of these impairments. Despite this evidence, the ALJ's decision is silent as to whether these impairments are severe or non-severe. (R. 17-19). As mentioned, there technically can be no error at step two where the ALJ finds at least one severe impairment— here, the ALJ found three severe impairments. But "[g]enerally, remand is warranted where the ALJ fails to consider evidence of an impairment at step two because it severely impacts the ALJ's opinion." *Staley v. Colvin*, 2016 WL 7447734, at *3 (S.D. Ind. Dec. 28, 2016). "Whether the ALJ finds an impairment is severe affects whether she makes a determination at step three and whether limitations are included in the RFC at step four." *Id.* Therefore, because the ALJ did not address several impairments at step two, this court cannot determine if or how these impairments affected the ALJ's analysis at later steps.

The Commissioner contends, however, that the ALJ did not need to address additional impairments because "it does not matter which impairment gave rise to which limitations, how any impairment is labeled, or what diagnoses the plaintiff carried, so long as the ALJ considered the limitations as demonstrated by the relevant evidence." (Commissioner's Brief, Dkt. 16, P. 7). Indeed, the ALJ's failure to address certain impairments at step two is inconsequential where he adequately addresses all severe and non-severe impairments later in the decision. *See Curvin*, 778 F.3d at 649-50. But the court is not convinced that the ALJ *ever* considered the impairments in question. The decision never expressly references Starla's

migraines, degenerative disc disease, asthma, carpal tunnel syndrome, peripheral

vestibulopathy, or hypertrophic obstructive cardiomyopathy; the failure to

specifically address these impairments calls into question the adequacy of the ALJ's

analysis.  Although the ALJ did touch on some of the symptoms and difficulties

associated with the impairments in question:

> The claimant alleges that due to her physical impairments, she has difficulty lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, climbing, and using her hands. She also alleges that performing tasks of personal care takes longer. The claimant further alleges that she does not prepare her own meals, do house or yard work, and only shops by computer. At the hearing, the claimant testified that she uses a cane while walking, and has a wheelchair for use at locations that do not have mobility carts. She also testified that she has difficulty typing, writing, and fastening buttons. The claimant further testified that she needs to lie down and rest multiple times per day.

(R. 20) (internal citations omitted).  The ALJ also acknowledged that "[t]he

record reflects complaints of generalized full body pain" and that Starla "has also

specifically reported pain in her low back, chest, head, neck, knees, elbows, and

hips."  *Id.*  Moreover, he considered that Starla has demonstrated spine tenderness

and that she has demonstrated a "decreased range of motion of her lumbar spine."

*Id.* at 21.  But again, the ALJ never expressly mentioned the impairments in

question—a "deficiency [that] is amplified by the fact that the ALJ took time to

describe other conditions as severe/non-severe."  (R. 20); *Olson*, 2014 WL 4792117,

at *5.  While this court's standard of review is deferential, "it does not mean that we

scour the record for supportive evidence or rack our brains for reasons to uphold the

ALJ's decision." *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002).  Here, it is not

clear that the ALJ considered Starla's migraines, degenerative disc disease, asthma, fatigue, carpal tunnel syndrome, peripheral vestibulopathy, and hypertrophic obstructive cardiomyopathy.  This is especially concerning given that Starla testified about several of these impairments during her hearing and gave testimony about how these impairments affect her functioning.  It was the ALJ's duty to draw a line of reasoning that the court can trace, which he failed to do; the court simply cannot identify any discussion of these impairments—at step two or anywhere else in the decision—and it cannot assume that the ALJ's summary of Starla's various symptoms was in reference to the impairments in question.  *See Clifford*, 227 F. 3d at 874.  In fact, it appears that the ALJ's summary of these symptoms was in reference to Starla's fibromyalgia and major joint dysfunction because these two impairments are referenced throughout this section of the ALJ's decision.  (R. 20-21).

Even if the ALJ was not convinced that sufficient evidence existed to support the impairments in question, he should have so stated.  *See Olson v. Colvin*, 2014 WL 4792117, at *5 (W.D. Wis. Sep. 24, 2014) ("Even if there were *insufficient* evidence to support the existence of *any* RA condition, the ALJ should have so stated. This is what the regulations require.")  Regardless, the record demonstrates that there is sufficient evidence to support Starla's assertion that she suffers from migraines, degenerative disc disease, asthma, fatigue, carpal tunnel syndrome, peripheral vestibulopathy, and hypertrophic obstructive cardiomyopathy.  And even if the ALJ was not convinced that these limitations were severe impairments, he

18

still had a duty to consider them because they may have been critical to the outcome of Starla's claim when considered with her other limitations and restrictions. *See* SSR 96-8p. Thus, remand is required.

**B. The court need not address Starla's claim that the ALJ erred in assessing the intensity, persistence, and limiting effects of Starla's symptoms.**

Starla also alleges that the ALJ did not satisfy SSR 16-3p when considering the intensity, persistence, and limiting effects of her symptoms. Because the court has already concluded that the ALJ patently erred by failing to consider several of Starla's impairments that are supported by the record evidence, remand is necessary. Therefore, the court does not need to address Starla's second claim and will not do so here.

## Conclusion

For the foregoing reasons, the Magistrate Judge recommends that the District Judge REVERSE and REMAND the Commissioner's decision that Starla was not disabled.

Any objections to this Report and Recommendation must be filed in accordance with 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P 72(b). The failure to file objections within 14 days after service will constitute a waiver of subsequent review absent a showing of good cause for that failure. Counsel should not anticipate any extension of this deadline or any other related briefing deadlines.

IT IS SO RECOMMENDED.

Date: 6/2/2022

Debra McVicker Lynch
United States Magistrate Judge
Southern District of Indiana

Distribution:

All ECF-registered counsel of record via email